Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3845 | **DATE** | 11/22/2000 |
| **CASE TITLE** | Sliter vs. Cruttenden Roth | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion [6] to dismiss plaintiffs' complaint is granted in part and denied in part. Counts I, III, IV and V are dismissed, but count II remains pending. Defendant is directed to answer count II within 30 days of this opinion's entry. Status hearing and scheduling conference is set for January 29, 2001 at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | NOV 27 2000 date docketed | 11 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | FILED FOR DOCKETING 00 NOV 22 PM 12:03 | 11/22/2000 date mailed notice | |
| MD | courtroom deputy's initials | Date/time received in central Clerk's Office | MD6 mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| DONALD & MARILYNN SLITER, | ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | No. 00 C 3845 |
| CRUTTENDEN ROTH, INC., | ) ) ) | |
| Defendant. | ) | |

DOCKETED
NOV 27 2000

## MEMORANDUM OPINION AND ORDER

Defendant, Cruttenden Roth, Inc., has moved to dismiss securities fraud action for failure to state a claim upon which relief may be granted. For the reasons stated below, the court grants the motion to dismiss counts I, III, IV and V, and denies the motion to dismiss Count II.[1]

## MOTION TO DISMISS STANDARDS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). Dismissal is appropriate only if it appears beyond a doubt that the plaintiff can prove no facts in support of its claim that would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 101, 102 (1957); *Kennedy v. Nat'l Juvenile Det. Assoc.*, 187 F.3d 690, 695 (7th Cir. 1999). In ruling on the motion, the court accepts as true all well pleaded facts alleged in the complaint, and it draws all reasonable inferences from those facts in favor of the plaintiff. *Jackson v. E.J.*

---

[1] Plaintiffs' filed a five count complaint but have stated that they intend to voluntarily dismiss counts I and III. In addition, plaintiffs state that they will amend count IV to specifically address Defendant's grounds for moving to dismiss that count. Presently, there is neither a voluntary dismissal nor an amended complaint on file. Although this opinion only examines counts II and V, counts I, III, and IV will be dismissed based on plaintiffs' representations.

*Brach Corp.*, 176 F.3d 971, 977 (7th Cir. 1999); *Zemke v. City of Chicago*, 100 F.3d 511, 513 (7th Cir.1996). "This is especially true when dealing with questions of materiality which, since they are 'mixed questions of law and fact,' require delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *Joyce v. Joyce Beverages, Inc.*, 571 F.2d 703, 706 (2d Cir. 1978) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S. Ct. 2126, 2133, 48 L. Ed. 2d 757 (1976)). "The issue on this Rule 12(b)(6) motion is whether the plaintiffs can prove any [misleading statements or omissions of fact]² that, had they been disclosed, would have been considered by the reasonable shareholder to have 'significantly altered the "total mix" of information made available.'" *Joyce*, 571 F.2d at 707 (citing *TSC Indus.*, 426 U.S. at 449, 96 S. Ct. at 2133).

In addition to the mandates of Rule 12(b)(6), Federal Rule of Civil Procedure 9(b) requires "all averments of fraud" to be "stated with particularity," although "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." The Seventh Circuit has explained that "the rule requires the plaintiff to state the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994).

## FACTS

Plaintiffs' complaint alleges the following facts. In January, 1999, plaintiffs purchased

---

²The court's actual words were "set of facts" rather than "misleading statements or omissions of fact."

40,000 shares, at $7 a share, of a privately-held Nevada corporation, quepasa.com. Sometime thereafter, quepasa.com hired defendant to assist in an initial public offering of 4,000,000 shares of its securities. Defendant, in an effort to stabilize quepasa.com's stock price and avoid flooding the market with 9,775,833 shares of outstanding stock when the 4,000,000 new shares were offered to the public, demanded that quepasa.com's stockholders "enter into lock-up agreements in which they agree not to sell or otherwise transfer any of their shares until 180 days from the date of the Prospectus without [defendant's] . . . prior written consent." (Compl. at ¶ 11.)

In addition, defendant advised quepasa.com that needed Securities and Exchange Commission ("the SEC") approval was unlikely if it continued to employ and to allow to remain a shareholder an individual, Richard Whelan, who had been fined and sanctioned for securities fraud and was under investigation by the SEC. In response to defendant's advice, quepasa.com looked for a non-affiliated purchaser for Whelan's stock. Whelan owned 443,500 shares and would not sell for less than $10 a share. After being contacted by First Midwest, a securities broker, in May, 1999, plaintiffs agreed to buy 50,000 shares at $10 a share, on the condition that the shares could be freely traded immediately after quepasa.com went public. A First Midwest employee, Timothy Watters, advised defendant of the plaintiffs' interest in purchasing the shares on condition that the buyers not be bound by defendant's lock-up restriction. Defendant responded that as an inducement for plaintiffs to purchase the stock, defendant

> would agree to release one-half of the shares (i.e., 221,750 shares) from the lock-up agreement prior to the end of the 180-day period if, after this offering, at least 2,000,000 shares of the common stock trade on the Nasdaq National Market at a price at least equal to the lesser of 120 % of the public of the public offering price or $14.40, and to release the remainder of such shares if at least 4,000,000 shares

3

trade at a price at least equal to the lesser of 120% of the public offering price or $14.40.

(Compl. at ¶18 (internal quotation marks and citation omitted).) Thereafter, Watters told plaintiffs that defendant agreed to release plaintiffs from the lock-up restrictions and that plaintiffs could sell any stock bought from Whelan immediately after quepasa.com went public subject to certain price and volume, but not timing, restrictions. Relying on Watters' representation and a faxed draft letter agreement from defendant which contained substantially the same language releasing plaintiffs from the lock-up restrictions as set out above, plaintiffs purchased 50,000 shares of Whelan's stock at $10 a share.

When plaintiffs attempted to sell 48,500 shares through First Midwest immediately after quepasa.com went public, First Midwest was informed by its clearing house that sale was not possible because sale of the stock was restricted under Rule 144(c)(1) of the Securities Act of 1933. *See* 17 C.F.R. § 230.144(c)(1). Due to the restriction, the First Midwest sell orders were rescinded. First Midwest, however, was obligated to cover the sell orders and instructed its clearing house to purchase and immediately resell 48,500 shares of quepasa.com stock. As such, First Midwest realized at least a $190,000 gain while plaintiffs were prevented from selling their stock despite the agreement that the stock could be sold immediately after quepasa.com went public. On June 23, 2000, plaintiffs filed a five-count complaint against defendant.[3]

## DISCUSSION

Count II of plaintiffs' complaint, at issue on the pending motion, alleges violation of § 10(b) and Rule 10b-5 of the Securities and Exchange Act of 1934, and Count V attempts to state

---

[3]Plaintiffs have also filed an arbitration claim against First Midwest with the NASD.

a claim for negligent misrepresentation under Illinois law. Defendant argues that plaintiffs have failed to plead fraud with particularity or to allege the reasonable reliance needed to state a claim under § 10(b). Further, defendants believe that even if the requisite reliance was alleged, plaintiffs could not prove their reliance was reasonable under any facts alleged in support of plaintiffs' claim. With regard to count V, defendant asserts that dismissal is warranted under Illinois' *Moorman* doctrine.

**Count II: Liability Under Section 10(b) and Rule 10b-5**

Section 10(b) of the Securities and Exchange Act of 1934 states that

> [i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security . . .[,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j (1997). Rule 10b-5 deems it "unlawful for any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R § 240.10b-5 (1999). A plaintiff claiming violation of Rule 10b-5 "must establish that: (1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages." *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997) (emphasis added).

As defendant notes, plaintiffs' complaint is bereft of any allegation that an employee of defendant directly spoke to plaintiffs. Instead, the complaint alleges that Watters relayed

5

defendant's representation that plaintiffs could sell as soon as quepasa.com went public subject only to price and volume, but not timing, restrictions. Plaintiffs do allege, however, that defendant faxed plaintiffs "a draft letter agreement outlining [defendant's] agreement to release [plaintiffs] from [defendant's] lock-up restrictions" and that plaintiffs relied on the draft letter agreement when they decided to purchase the stocks. (Compl. at ¶ 20 & 21.) The draft letter agreement, Exhibit 2 to the complaint, essentially repeats the offer plaintiffs' allege defendant relayed through Watters, while omitting mention of a Rule 144 restriction. Plaintiffs' allegations, therefore, state "the who, what, when, where, and how" required by Federal Rule of Civil Procedure 9(b). *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

Section 10(b) actions, however, require plaintiffs to allege a defendant's scienter with particularity, as opposed to generally averring such state of mind. *See* 15 U.S.C. § 78u-4(b)(2) (requiring securities fraud complaints "with respect to each act or omission alleged to violate this chapter, [to] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"); *Law v. Medco Research, Inc.*, 113 F.3d 781, 785 (7th Cir. 1997) (requirements for pleading fraud with particularity "stiffened for securities fraud cases" under 15 U.S.C. § 78u-4(b)(2)). The Supreme Court has defined scienter as "the mental state embracing intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12, 96 S. Ct. 1375, 1381, 47 L. Ed. 2d 668 (1976), and this state of mind "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1253 (N.D. Ill. 1997) (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). Here, plaintiffs have

alleged that defendant had both a motive, the necessity of finding purchasers for the Whelan shares before quepasa.com could go public, and the opportunity, during negotiations with potential purchasers of the Whelan shares, to commit fraud.

In addition, the omission of any Rule 144 restriction from the draft letter agreement may have been material under the circumstances of the parties' dealings. Rule 144 "is designed to prohibit the creation of public markets in securities of issuers concerning which adequate information is not available to the public." Preliminary Note to Rule 144. In general, under the Securities Act of 1933, every sale of securities must be registered or sold pursuant to a statutory exemption from registration. *See* 15 U.S.C. §§ 77e, 77d(2). Rule 144 creates a safe harbor for sellers of exempt securities who are not deemed to be "underwriters," defined as "links in a chain of transactions through which securities move from an issuer to the public." Preliminary Note to Rule 144. Where a seller of unregistered (exempt) securities is not an underwriter as Rule 144(b) prescribes, then the Rule protects that seller from liability on claims that the seller had engaged in an unregistered distribution of stock. *Buck v. U.S. Digital Communications, Inc.*, 141 F.3d 710, 712 (7th Cir. 1998). But this safe harbor is conditioned on the existence of adequate public information concerning the issuer. Rule 144(c) deems adequate information available only where certain reporting requirements are met, which quepasa.com did not meet. As a result, the Rule imposed a one-year holding period during which the securities could not be resold in reliance on the safe harbor provision. *See* Rule 144(d)(1).

The omission from the draft letter agreement of the impediment that Rule 144 imposed, under the circumstances, could have been material under § 10(b). Although defendant did not have the ability to release a buyer from a Rule 144 restriction, where plaintiff's specific goal was

to sell as soon as quepasa.com went public and where defendant knew their goal, the omission may have led plaintiffs to understand that no restriction existed or would exist by the time quepasa.com went public. Further, this court cannot say that plaintiffs' alleged reliance on the letter agreement was not reasonable as matter of law.

Defendant calls the court's attention to the following paragraphs of the Stock Purchase Agreement, documenting the transaction between Whelan and plaintiffs, in which plaintiffs acknowledged that the shares were not registered and subject to the restrictions of Rule 144:

> . . . (4) Buyer acknowledges that (i) the Shares have not been registered under the Securities Act of 1933, or applicable state securities laws and hence cannot be sold unless they are subsequently registered or an exemption from such registration is available; (ii) the Shares are highly speculative, involve a high degree of risk and should only be purchased by individuals who cannot afford to lose their entire investment; and (iii) the certificates for the Shares will contain an appropriate restrictive legend prohibiting their sale or transfer, except under certain circumstances in substantially the following form:
>
>> "The shares represented by this Certificate have not been registered under the Securities Act of 1933 (the "Act") and are "restricted securities" as that term is defined in Rule 144 under the Act. The shares may not be offered for sale, sold or otherwise transferred except pursuant to an effective registration statement under the Act or pursuant to an exemption from registration under the Act, the availability of which is to be established to the satisfaction of the Company."
>
> * * *
>
> 10. <u>Rule 144 limitation</u>. . . . Buyer acknowledges and understands that, if the Shares are held for a period of at least one year, and if Rule 144 (the "Rule") is applicable (there being no representation by Seller that it will be applicable), then only routine sales of the Shares in limited amounts in a specified manner and in accordance with the terms and conditions of the Rule are permitted. If the Rule is not applicable, any sales may be made only pursuant to an effective registration statement or an available exemption from registration.

(Compl., Ex. 3). The problem with defendant's argument is that the plaintiffs' belief that they could sell the shares after the initial public offering is not inconsistent with the Stock Purchase

8

Agreement, and it could be that plaintiffs were not in a position to ascertain the information they needed in order to know that the sale would be restricted. If facts such as that can be established, then an inference of reasonable reliance on the omission in the draft letter agreement might be appropriate. *Cf. Fugman v. Aprogenex, Inc.*, 961 F. Supp. 1190, 1197-98 (N.D. Ill. 1997) (cautionary language in the defendant company's written publications did not contradict other representations on which the plaintiff reasonably relied). Paragraph 10 can certainly be interpreted as implying that the restriction might be lifted. The Stock Purchase Agreement merely shows that at the time plaintiffs purchased the shares Rule 144 prevented an immediate sale, but it does not indicate that such a sale was neither possible nor contemplated. Indeed, the stock purchase was made on the understanding that the shares could be sold after quepasa.com went public. For all these reasons, defendant's motion to dismiss count II is denied.

**Count V: Negligent Misrepresentation**

Illinois courts have developed a rule, known as the *Moorman* doctrine or the economic loss rule, which generally prohibits recovery in tort for pure economic losses. *See Radtke v. Murphy*, 312 Ill. App. 3d 657, 664, 728 N.E. 2d 715, 721, 245 Ill. Dec. 633, 639 (App. Ct. 2000) (citing *Moorman Mfg. Co. v. Nat'l Tank Co.*, 91 Ill. 2d 69, 435 N.E. 2d 443, 61 Ill. Dec. 746 (1982)); *Stinnes Corp. v. Kerr-McGee Coal Corp.*, 309 Ill. App. 3d 707, 716, 722 N.E. 2d 1167, 1174, 243 Ill. Dec. 98, 105 (App. Ct. 2000). The *Moorman* court, however, stated that an exception to the economic loss rule exists for negligent misrepresentations made by defendants who are in the business of supplying information for the guidance of others. *Moorman*, 91 Ill. 2d at 89, 435 N.E. 2d at 452, 61 Ill. Dec. at 755; *Radtke*, 312 Ill. App. 3d at 664, 728 N.E. 2d at 721, 245 Ill. Dec. at 639. In *Congregation of the Passion, Holy Cross Province v. Touche Ross &*

*Co.*, the Illinois Supreme Court further explained that "[w]here a duty arises outside of the contract, the economic loss doctrine does not prohibit recovery in tort for negligent breach of that duty." 159 Ill. 2d 137, 162, 636 N.E. 2d 503, 514, 201 Ill. Dec. 71, 82 (1994). In that case, the Illinois Supreme Court found that an attorney-client or accountant-client relationship fit within this limited exception, but an architect-client relationship did not, because the "knowledge and expertise [an accountant provides] cannot be memorialized in contract terms, but is expected independent of the accountant's contractual obligations." *Id.*, 159 Ill. 2d at 163, 636 N.E. 2d at 515, 201 Ill. Dec. at 83. Although the distinction the court made in *Congregation* may not be entirely clear, this court is satisfied that the courts of Illinois would not extend the *Moorman* exception to the facts alleged in Count V.

Plaintiffs' complaint states that defendant, as an underwriter of securities, owed them a fiduciary duty. First, plaintiffs fail to cite any case holding that underwriters of securities owe fiduciary duties to stock purchasers under Illinois law. *See Johnson v. Mut. Sav. Bank*, No. 95 C 2379, 1996 WL 79414, at *5 (N.D. Ill. Feb. 21, 1996) (no Illinois authority stating that "sellers of securities owe fiduciary duty to the buyers of the securities"). Second, "Illinois courts have recognized . . . that the exception to the *Moorman* doctrine enunciated in *Congregation of Passion* is limited to professional malpractice claims and, as *Congregation of Passion* itself makes clear, not all professional relationships fall within this limited exception." *Steinberg v. Kendig (In re Ben Franklin Retail Stores, Inc.*, 225 B.R. 646, 657 (Bankr. N.D. Ill. 1998), *remanded on other grounds*, 2000 WL 28266 (N.D. Ill. 2000). The relationship between plaintiffs and defendant cannot be analogized to an attorney-client or accountant-client relationship, where the client entrusts the professional with decision-making on the client's

behalf. As such, this case is not encompassed by the limited *Moorman* exception for negligent misrepresentations, and count II must be dismissed.

## CONCLUSION

For the above-stated reasons, the court grants in part and denies in part defendants' motion to dismiss plaintiffs' complaint. Counts I, III, IV and V are dismissed, but count II remains pending. Defendant is directed to answer count II within 30 days of this opinion's entry.

Date: November 22, 2000

Enter: _____
JOAN HUMPHREY LEFKOW
United States District Judge